UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL D. STRANEY,

                    Plaintiff,                       Civil Action No.
                                                  06-CV-12152

vs.

                                              HON. BERNARD A. FRIEDMAN

GENERAL MOTORS CORPORATION,

                    Defendant.

_____/


**OPINION AND ORDER**
**GRANTING DEFENDANT'S MOTION TO AFFIRM THE PLAN ADMINISTRATOR'S**
**DECISION DENYING PLAINTIFF BENEFITS, GRANTING DEFENDANT'S MOTION**
**TO DISMISS COUNT TWO OF THE COMPLAINT, AND GRANTING IN PART AND**
**DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

        This matter is presently before the Court on Defendant's Motion to Affirm the Plan

Administrator's Decision, Defendant's Motion to Dismiss under Federal Rule of Civil Procedure

12(b)(6), and Defendant's Motion for Summary Judgment ("Defendant's Motion") [docket entry

19].  On August 29, 2007, Plaintiff filed a response.  Defendant filed a reply on September 10, 2007.


        The Court has had the opportunity to thoroughly examine the pleadings, documents,

and evidence submitted by the parties in this matter.  Pursuant to E.D. Mich. LR 7.1(e)(2), the Court

will decide this matter without oral argument.  For the reasons stated below, the Court will grant

Defendant's Motion to Affirm the Plan Administrator's Decision, grant Defendant's Motion to

Dismiss under Federal Rule of Civil Procedure 12 (b)(6), and grant in part and deny in part

Defendant's Motion for Summary Judgment.  Section I of this Opinion and Order outlines the

pertinent facts surrounding this controversy.  Section II discusses the standards under Federal Rules

of Civil Procedure 12(b)(6) and 56(c).  In Section III, the Court considers Defendant's Rule 12(b)(6)

Motion to Dismiss Plaintiff's breach of fiduciary duty claims under ERISA.  Section IV discusses

whether Plaintiff's state law claims are preempted by ERISA.  Section V addresses Defendant's

Motion to Affirm the Plan Administrator's Decision.  In Section VI, the Court discusses Plaintiff's

estoppel claim under ERISA.  Finally, in Section VII, the Court concludes.

I.      **FACTUAL BACKGROUND**

        This is an ERISA case involving a former executive's eligibility for retirement

benefits under a Supplemental Executive Retirement Program ("SERP").  Michael D. Straney

("Plaintiff" or "Straney") worked for General Motors Corporation ("Defendant" or "GM") from

October 3, 1960, until March 1, 1994.  (Pl.'s Resp. to Def.'s Statement of Material Facts Not in

Dispute at ¶¶ 2, 4.)  Plaintiff was promoted to executive status at GM's Saginaw Final Drive and

Forge Business Unit on January 1, 1980.  (*Id*. at ¶ 3.)  As an executive, Plaintiff hoped to participate

in and become eligible for GM's SERP (Pl.'s Compl. at ¶ 9.)  The main issue presented in this case

is whether Plaintiff is entitled to receive SERP benefits under either GM's SERP, or under Delphi

Corporation's SERP.[1]  The Court notes at the onset that the pertinent terms of both SERPs are

substantially identical.[2]  Both contain several eligibility requirements.  The important one for the

_____

[1] According to Defendant, on January 1, 1999, it transferred certain assets and liabilities
to Delphi Corporation ("Delphi") (Def.'s Mot. at 1.)  As part of this transaction, GM entered into
agreements with Delphi in which Delphi assumed financial responsibility of certain
employment-related claims for so-called "Delphi terminated employees."  (*Id*.)  Plaintiff is a
member of this class of former employees.  (*Id*.)

[2] Therefore, in the interest of space, the Court will discuss and quote language from only
the GM SERP.

purposes of this litigation is that an executive "be at least 62 years old at retirement" in order to be eligible to receive SERP benefits.

In 1993, GM began negotiating the sale of its Saginaw Final Drive and Forge Business Unit plant to American Axle & Manufacturing, Inc. ("AAM") (Pl.'s Compl. at ¶ 10.) According to Plaintiff, in order to make the terms of the sale more attractive to AAM, GM persuaded key executives, including Plaintiff, to separate from GM and transition to AAM. (*Id*. at ¶ 12.) However, Plaintiff was concerned about how the transition from GM to AAM might affect his retirement benefits. (*Id*. at ¶ 14.) Plaintiff was particularly concerned about his SERP benefits because he was only 51 years old at the time, 11 years shy of the threshold age requirement contained in both SERPs. Therefore, before agreeing to transition from GM to AAM, Plaintiff "discussed his benefits with those persons at GM who were directly involved in negotiations with AAM." (Pl.'s Compl. at 14.) According to the Complaint,

> GM represented to Straney that if he transitioned his employment from GM to AAM his retirement benefits would not be prejudiced because employment at AAM would qualify as employment by GM for purposes of benefit eligibility and computation. Therefore, Straney would retain credit for all benefits which had vested while he was employed by GM and that his benefits would continue to accrue while at AAM, with GM and AAM sharing the final costs of those benefits based on the amount of time which Straney worked for each company.

(Pl.'s Compl. at ¶ 16.) Indeed, Plaintiff maintains that he was assured that neither the sale of the Saginaw Final Drive and Forge Business Unit nor Plaintiff's transition from GM to AAM would effect his retirement benefits, and that employment at AAM would be treated as employment by GM for the purposes of retirement benefit eligibility. (*Id*.) In other words, Plaintiff alleges that, before he agreed to transition to AAM, GM represented to him that employment at AAM would constitute qualifying employment for the purposes of SERP eligibility. (*Id*. at ¶ 38.) According to Defendant,

at no time during these pre-transition talks did anyone specifically mention SERP benefits. (Def.'s Reply at 2-3.) Plaintiff does not appear to dispute this, but maintains that he reasonably believed that any reference to retirement benefits or benefit eligibility also applied to the SERP, since a SERP is a retirement benefit.

Relying on these alleged representations, Plaintiff agreed to separate from GM and transition to AAM. (Pl.'s Resp. to Def.'s Statement of Material Facts Not in Dispute at ¶ 7; Pl.'s Compl. at ¶ 17.) He did so on March 1, 1994. (*Id*.) At the time of his separation from GM, Plaintiff was 51 years old. (Pl.'s Resp. to Def.'s Statement of Material Facts Not in Dispute at ¶ 1.) According to Plaintiff, he "would not have transitioned from GM to AAM but for GM's representations." (Pl.'s Compl. at ¶ 19.) When Plaintiff retired from AAM on January 1, 2005, he was over the age of 62. (*Id*. at ¶ 20.) Plaintiff contends that he was entitled to receive SERP benefit payments from GM at that time. (*See id.* at ¶ 20.)

Soon after retirement, Plaintiff applied for his SERP benefits via a letter dated August 8, 2005, addressed to three individuals: (1) Ms. Kathleen Barclay, GM Vice-President, Human Resources; (2) Mr. Mark Weber, Delphi's Executive Vice-President-Operations, Human Resource Management and Corporate Affairs; and (3) Mr. Kevin Butler, Delphi's Vice-President, Human Resource Management. (*see* Def.'s Statement of Material Facts Not in Dispute at Ex. F.) In this letter, Plaintiff admitted that he was informed in 2000 that he was not eligible for SERP benefits, but explained that he decided to wait until he retired to pursue the issue since it became clear to him that it would be a time-consuming process. (*Id*.) Plaintiff also explained that three individuals, all of whom were responsible for the sale of the Saginaw Final Drive and Forge Business Unit to AAM, told him before he transitioned to AAM that his retirement would be the same after the sale and

would be a shared expense between GM and AAM based on combined years of service. (*Id.*) Those individuals were: (1) Mr. John Monk, the GM executive in charge of the sale of the Saginaw Final Drive and Forge Business Unit and Director of Finance/CFO-Saginaw Division; (2) Mr. Jeff Kimpan, Director of Human Resources-Saginaw Division; and (3) Mr. Bill Herren, Director of the Final Drive & Forge Business Unit-Saginaw Division. (*Id.*)

Plaintiff received two separate responses to his August 8, 2005 letter. The first was an undated letter received by Plaintiff on September 30, 2005, from Mr. Walter Ralph, GM's Manager of Global Human Resources. In this letter, Mr. Ralph reiterated that GM "does not retain any liability for Supplemental Executive Retirement Program (SERP) benefits for executives transferring to AAM" and that such obligations, if any, "are now the responsibility of Delphi." (*See id.* at Ex. H.)

The second letter that Plaintiff received in response to his August 8, 2005 letter was from Mr. James Petrie, Delphi's Corporate Pension Staff, on September 19, 2005. (*See id.* at Ex. I.) In this letter, Mr. Petrie indicated that he contacted two of the executives that Plaintiff referred to in his August 8, 2005 letter. (*Id.*) According to Mr. Petrie, both "were positive there was no discussion about a GM Supplemental Executive Retirement Program ("SERP") benefit with executives transferred to AAM." (*Id.*) "What was confirmed was that all salaried employees, including executives, were advised that their GM credited service would be combined with their American Axle ("AAM") credited service for determining retirement eligibility." (*Id.*)

In addition, Mr. Petrie cited the language of both the Delphi SERP[3] and the Asset

---

[3] The Delphi SERP specifies that an executive must be age 62 in order to be eligible for the SERP, and that Plaintiff was not 62 on March 1, 1994, when he separated from GM and began working for AAM.

Sale Agreement between GM and AAM,[4] in support of his conclusion that, "at the time of the sale [of the Saginaw Final Drive and Forge Business Unit from GM] to AAM, GM did not retain any SERP obligation to transferred executives." (*Id*.) Mr. Petrie concluded with the statement: "[i]f you are not satisfied with this answer, you have the right to file an appeal with the Plan Administrator." (*Id*.)

On September 27, 2007, Plaintiff responded to Mr. Petrie's September 19, 2007 letter. (*See id.* at Ex. J.) In his response, Plaintiff articulated his belief that not only did Mr. Monk, Mr. Kimpan, and Mr. Herren know about Section 5.3.1 of the Asset Sale Agreement, they also knew that length of employment at GM and AAM would *not* be combined for the purpose of SERP eligibility. Plaintiff then concluded that they "knew full well that the GM executives who would transition to AAM would have a material change in their retirement program." (*Id*.) Plaintiff stated that neither his September 27, 2007 letter, nor his August 8, 2007 letter, were "about the words in the Delphi Pension Plan but are about information withheld by the noted GM executives from those GM executives who would transition to AAM . . ." (*Id*.) Plaintiff then demanded that GM or Delphi "make good on what was said by John Monk, Jeff Kimpan and Bill Herren . . . and pay [his] GM/Delphi SERP retirement . . ." (*Id*.)

---

[4] Section 5.3.1 of the Asset Sale Agreement between GM and AAM states, in pertinent part:

> AAM will provide each salaried Transitioned Employee with . . . (iii) employee benefit plans and programs (*excluding plans and programs limiting coverage to executives*) which are substantially similar in the aggregate to those provided by GM immediately prior to the date of the closing.

(emphasis added)

Mr. Petrie did not respond to this letter. On January 30, 2006, Mr. Petrie provided Plaintiff with the language of the January 1, 1999 Delphi SERP (as amended on October 10, 2005). (*See id.* at Ex. K.) Mr. Petrie also provided Plaintiff with a copy of Section 5.3.1 of the Asset Sale Agreement between GM and AAM. (*See id.*) Plaintiff apparently requested this documentation. In an undated letter received by Plaintiff on January 23, 2006, Mr. Ralph sent Plaintiff a copy of the GM SERP per Plaintiff's request. (*See id.* at Ex. L.)

As far as the Court is aware, there was no further communication between the parties until February 23, 2006, when Plaintiff's attorney, Mr. Stephen Wasinger, sent a demand letter to Mr. Ralph and Delphi's Plan Administrator. After receiving no response, Plaintiff commenced this lawsuit on May 10, 2006. The Complaint contains six counts: (1) Claim for Benefits Under ERISA § 502; (2) Violation of ERISA § 404 (breach of fiduciary duty); (3) Estoppel; (4) Breach of Contract; (5) Common Law Fraud and Silent Fraud; and (6) Innocent Misrepresentation. Counts (1) through (3) arise under federal law. The remaining counts are state law claims.

## II.    STANDARDS FOR SUMMARY JUDGMENT AND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

### A.    *Summary Judgment Standard*

According to Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The United States Supreme Court has held that there are no genuine issues of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In addition,

> [i]n our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he burden on the moving party may be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Thus, "[t]he moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact." *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).

Once the moving party discharges this burden, the burden then shifts to the nonmoving party. *See id.* "[T]he nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Id.* (citing FED. R. CIV. P. 56(e); *Celotex Corp.*, 477 U.S. at 324). Indeed, the nonmoving party "must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment." *Id.* "When reviewing a motion for summary judgment, [the court] must draw all justifiable inferences in the light most favorable to the non-moving party." *Hager v. Pike County Bd. of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002).

B.     *Standard for Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted*

The standard for reviewing a motion under Rule 12(b)(6) has been succinctly articulated by the Sixth Circuit:

> [a] Court must construe the complaint in the light most favorable to the

plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. A complaint need only give "fair notice of what the plaintiff's claim is and the grounds upon which it rests." A judge may not grant a Fed.R.Civ.P. 12(b)(6) motion to dismiss based on a disbelief of a complaint's factual allegations. While this standard is decidedly liberal, it requires more than the bare assertion of legal conclusions. "In practice, 'a ... complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory.'"

*In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993) (internal citations omitted) (emphasis in original).

III     **DEFENDANT'S RULE 12(b)(6) MOTION TO DISMISS COUNT TWO OF THE COMPLAINT**

Count Two of Plaintiff's Complaint alleges that Defendant violated 29 U.S.C. §§ 1104 and 1106. Both of these sections of the U.S. Code fall under ERISA's fiduciary responsibility provisions. In order to determine whether these claims are viable, and therefore capable of withstanding Defendant's motion to dismiss under Rule 12(b)(6), the Court must determine whether the GM and Delphi SERPs qualify as so-called "top-hat plans" under 29 U.S.C. § 1051(2). This determination is crucial because top-hat plans are exempt from ERISA's fiduciary responsibility provisions, including 29 U.S.C. §§ 1104 and 1106. *See, e.g., Bakri v. Venture Mfg. Co.*, 473 F.3d 677, 678 (6th Cir. 2007) (citing *Gallione v. Flaherty*, 70 F.3d 724, 727 (2d Cir.1995)); *see also*, 29 U.S.C. § 1101(a)(1) (excluding top-hat plans from ERISA's fiduciary responsibility provisions codified at 29 U.S.C. §§ 1101-1114 ).[5] With respect to top-hat plans, courts are in agreement that

_____

[5] The Court also notes that top-hat plans are exempt from ERISA's provisions on participation, vesting, and funding. *See* 29 U.S.C. § 1051(2) (excluding top-hat plans from ERISA's participation and vesting provisions codified at 29 U.S.C. §§ 1051-1061); 29 U.S.C. § 1081(a)(3) (excluding top-hat plans from ERISA's funding provisions codified at 29 U.S.C. §§ 1081-1086). However, top-hat plans are not exempt from ERISA's reporting and disclosure

there is no cause of action for breach of fiduciary duty under ERISA. *See, e.g., In re New Valley Corp.*, 89 F.3d 143, 153 (3d Cir. 1996); *Demery v. Extebank Comp. Plan*, 216 F.3d 283, 290 (2d Cir. 2000) (affirming the lower court's dismissal of plaintiff's breach of fiduciary duty claims to the extent that they were based on ERISA because the plan qualified as a top-hat plan); *Duggan v. Hobbs*, 99 F.3d 307, 313 (9th Cir. 1996) (same).[6]

Defendant maintains that the GM and Delphi SERPs qualify as top-hat plans. As such, Defendant argues that Plaintiff's breach of fiduciary duty claims under 29 U.S.C. §§ 1104 and 1106 must be dismissed under Rule 12(b)(6) because sections 1104 and 1106 do not apply in the case of a top-hat plan. Plaintiff, on the other hand, contends that the two SERPs do not qualify as top-hat plans. According to Plaintiff, then, his claims under sections 1104 and 1106 are viable. For the reasons that follow, the Court finds that the GM and Delphi SERPs unquestionably qualify as top-hat plans, and will therefore dismiss Plaintiff's claims under 29 U.S.C. §§ 1104 and 1106 because these sections do not apply to plan administrators of a top-hat plan.

A top-hat plan is "a plan which is unfunded and is maintained by an employer

---

provisions, which are codified at 29 U.S.C. §§ 1021-1031, or its administration and enforcement provisions, codified at 29 U.S.C. §§ 1131-1145.

[6] The Department of Labor has explained the policy reasons underlying the special top-hat regime:

> in providing relief for "top hat" plans from the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their positions or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and therefore, would not need the substantive rights and protection of Title I.

DOL Op. Letter 90-14A.

primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. § 1051(2). "The burden of establishing that a plan fits the 'top hat' exclusion is on the party asserting that it is a 'top hat' plan." *In re IT Group, Inc.*, 305 B.R. 402, 407 (Bankr. D. Del. 2004) (citing *Carrabba v. Randalls Food Mkts., Inc.*, 38 F. Supp.2d 468, 477 (N.D. Tex. 1999)). Here, Defendant has the burden of proof.

In determining whether a plan qualifies as a top-hat plan, the Sixth Circuit has instructed courts to

> consider both qualitative and quantitative factors, including (1) the percentage of the total workforce invited to join the plan (quantitative), (2) the nature of their employment duties (qualitative), (3) the compensation disparity between top hat plan members and non-members (qualitative), and (4) the actual language of the plan agreement (qualitative).

*Bakri*, 473 F.3d at 678. The parties do not dispute the funding requirement contained in 29 U.S.C. § 1051(2), and upon further review, the Court is satisfied that this requirement is met. The parties do, however, dispute the remaining requirements: (1) whether the purpose of the plan is to provide deferred compensation and (2) whether the plan participants represent a select group of management or highly compensated employees. The Court will examine these two elements, in turn, below. However, before doing so, the Court pauses to consider the plain language of the SERPs, because the language is pertinent to both contested elements.

The language of the SERPs—by itself—provides substantial support for Defendant's position that the plans qualify as top-hat plans. The GM SERP provides, at section II(a), that "[t]his Program . . . . shall be maintained as an unfunded Program providing deferred compensation for a select group of management or highly-compensated employees under Section 201(2) of ERISA."

(*See* Def.'s Statement of Material Facts Not in Dispute at Ex. D.)  The Delphi SERP contains

identical language at its section II(a).  (*See id.* at Ex. E.)  The Court notes that this language tracks

ERISA's definition of a top hat plan: "a plan which is unfunded and is maintained by an employer

primarily for the purpose of providing deferred compensation for a select group of management or

highly compensated employees."  29 U.S.C. § 1051(2).  The Sixth Circuit has held that the actual

language of the plan agreement should be considered when determining whether the plan qualifies

as a top-hat plan.  *See Bakri*, 473 F.3d at 678.  The fact that the actual language of the GM and

Delphi SERPs is virtually identical to the statutory definition of a top-hat plan is very strong

evidence of the SERPs' true nature.

> A.     *The "Deferred Compensation" Requirement*

Very few courts of appeal have had the occasion to address the meaning of *deferred*

*compensation* in the context of a top-hat plan under ERISA.  However, the Court finds one particular

case out of the Third Circuit instructive:

> [a] deferred compensation plan 'is an agreement by the employer to pay
> compensation to employees at a future date.  The main purpose of the plan
> is to defer the payment of taxes.'  The idea is to defer the receipt of
> compensation until retirement or termination of employment, when the
> employee is in a lower tax bracket, thus reducing the overall amount of taxes
> paid.

*In re IT Group, Inc.*, 448 F.3d 661, 664 (3d Cir. 2006) (quoting David J. Cartano, *Taxation of*

*Compensation & Benefits* §§ 20.01 & 20.02[A] at 709-710 (2004)).

Plaintiff argues that GM failed to offer evidence to establish whether the SERP

agreements are maintained primarily to provide deferred compensation, on the one hand, or simply

to provide an additional retirement benefit, on the other hand.  (*See* Pl.'s Resp. at 15.)  Plaintiff cites

the language at Section I of the GM SERP:

> [t]he purpose of the General Motors Supplemental Executive Retirement Program . . . is to provide . . . an overall level of monthly retirement benefits which are competitive with the benefits provided executives retiring from other major U.S. industrial companies.

(*See* Def.'s Statement of Material Facts Not in Dispute at Ex. D.)  According to Plaintiff, "by its terms, [the] SERP is an additional retirement benefit," not a deferred compensation plan.  (Pl.'s Resp. at 15.)

Conversely, Defendant argues that the terms of the GM and Delphi SERPs establish that they are deferred compensation plans.  Defendant also relies on the language of the SERP: "[t]his Program . . . . shall be maintained as an unfunded Program providing *deferred compensation* for a select group of management or highly-compensated employees under Section 201(2) of ERISA."  (*See* Def.'s Statement of Material Facts Not in Dispute at Ex. D) (emphasis added).  Based on the unequivocal language of the two SERPs, the Court is convinced that both SERPs are primarily maintained for the purpose of providing deferred compensation to a select group of management or highly-compensated employees.  The language cited by Plaintiff does not expressly or implicitly dictate the opposite result.  That is, Plaintiff has offered no evidence that retirement benefits cannot constitute deferred compensation.  Without such evidence, Plaintiff's argument cannot stand.

B.      *The Selectivity Requirement*

"[E]mployees are part of a 'select group' under section 1101(a)(1) where the employer's retirement-plan coverage is limited to a small percentage of the employer's entire work force."  *Duggan*, at 99 F.3d at 312 (holding that a plan covered a select group where less than 5%

of the workforce was covered by the agreement).  *See also Pane v. RCA Corp.*, 868 F.2d 631, 637 (3d Cir.1989) (holding that a plan covered a select group where less than one-tenth of one percent of the work force was covered); *Belka v. Rowe Furniture Corp.*, 571 F.Supp. 1249, 1251-1252 (D.C. Md. 1983) (holding that a plan covered a select group where 4.6% of the work force was covered by the agreement); DOL Op. Letter 75-64 (Aug. 1, 1975) (holding that a plan covered a select group where 4% of active employees were covered).  "[T]here is no existing authority that establishes when a plan is too large to be deemed 'select.'"  *Demery*, 216 F.3d at 288.  In *Demery*, the Second Circuit held that, "while . . . [15.34%] is probably at or near the upper limit of the acceptable size for a 'select group,' we cannot say that it alone made Plan B too broad to be a top hat plan . . ."  *Id.* at 289.  Indeed, viewing the plan as a whole and considering the positions held by the plan's participants, the *Demery* court found that a plan covering 15.34% of the workforce met the selectivity requirement.  *Id.* at 287.

On the facts of the present case, the selectivity requirement is clearly met.  Mr. Ralph and Mr. DeMarco, in their affidavits, testified that approximately five and four percent of GM and Delphi's total workforce, respectively, participate in the SERP.  (*See* Def.'s Reply at Ex. A, ¶ 3; Ex. B, ¶ 3.)  Furthermore, Frederic P. Vanden Berg, a former GM executive, testified in his deposition that less than ten employees at the Saginaw Final Drive and Forge Business Unit participated in the SERP.  (*See* Pl.'s Resp. at Ex. 4, p. 28.)[7]  The affidavits of Mr. Ralph and Mr. DeMarco, the deposition testimony of Mr. Vanden Berg, and the plain language of the SERPs, constitute sufficient evidence supporting the selective nature of the two SERPs.

---

[7] Straney, in his deposition, implicitly testified that there were 7,500 people who worked at the Saginaw Final Drive and Forge Business Unit.  (*See* Pl.'s Resp. at Ex. 1, pp. 40, 191.)

"But the 'select group' requirement includes more than a mere statistical analysis."

*Duggan*, 99 F.3d at 312. As mentioned above, the Department of Labor has explained that the top-hat exception was intended to apply to employees who

> by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan . . .

*See id.* at 312-313 (quoting DOL Op. Letter 90-14A). "Ability to negotiate is an important component of top hat plans . . ." *Demery*, 216 F.3d at 289. Indeed, "top hat plans have been exempted from ERISA's substantive requirements 'because Congress deemed top-level management, unlike most employees, to be capable of protecting their own pension expectations.'" *Id.* (quoting *Gallione*, 70 F.3d at 727). As to Plaintiff's ability to affect or substantially influence the design and operation of the GM and Delphi SERPs, the record is silent. Plaintiff contends that "[his] circumstances (and his testimony about how he was notified of SERP eligibility) destroy any argument that [he] was able to 'affect or substantially influence, through negotiation or otherwise,' his deferred compensation plan." (Pl.'s Resp. at 16.) However, Plaintiff was part of an elite group within GM. Plaintiff's own brief notes that he was a "key" employee and "indeed . . . the highest ranking employee of the Saginaw Unit." (*Id.* at 5.) Therefore, if anyone at the Saginaw Final Drive and Forge Business Unit had the ability to affect or substantially influence his SERP, it was Plaintiff.[8] The mere fact that Plaintiff was denied SERP benefits does not render him incapable of negotiation with respect to design and operation of the SERP. Furthermore, the affidavits of Mr.

---

[8] If the Court accepts as true Plaintiff's statement that he was the "highest ranking employee of the Saginaw Unit," then clearly *no one* at the Final Drive and Forge Business Unit would have the ability to affect or substantially influence the design and operation of their SERP.

Ralph and Mr. DeMarco support the Court's conclusion that the employees who are eligible for the

GM and Delphi SERPs have the ability to affect or substantially influence the design and operation

of their deferred compensation plan. Mr. Ralph, in his affidavit, states that

> [t]o be eligible to participate in the SERP, one must have attained Executive
> status at GM. GM executive status is limited to those individuals who have
> a high level of job responsibility and decision-making authority in the GM
> organization.

(*See* Def.'s Reply at Ex. A, ¶ 4.) Mr. DeMarco's affidavit contains language of similar import

regarding executive status at Delphi. (*See* Def.'s Reply at Ex. B, ¶ 4.) Given this evidence, the

Court finds this prong of the test satisfied.[9]

In light of the evidence described above, especially the plain language of the SERP

agreements, there is no doubt that the GM and Delphi SERPs qualify as top-hat plans. Because the

SERPs are top-hat plans, ERISA's fiduciary duty provisions do not apply. Therefore, Plaintiff's

claims under 29 U.S.C. § 1104 and 1106 fail as a matter of law and must be dismissed.

Additionally, Plaintiff argues that he still has a viable claim for breach of fiduciary

---

[9] Plaintiff argues that Mr. Ralph and Mr. DeMarco's affidavit testimony regarding SERP
eligibility violates the Best Evidence Rule. Specifically, Plaintiff contends that the eligibility
requirements are contained in documents and Mr. Ralph and Mr. DeMarco are attempting to
"prove the 'contents' of the SERP documents" in their respective affidavits. (Pl.'s Resp. Br.
Pursuant to Ct.'s Or. at 2 n.1.) This argument is meritless for several reasons. First, the SERP
documents are in the record. Second, even if they were not in the record, the affidavits are not
an attempt to prove the contents of the SERP documents because the matters discussed in the
affidavits are not addressed in the SERP documents. If anything, the affidavits are an attempt to
supplement the SERP documents with more specific facts and data. Third, even if the matters
discussed in the affidavits are addressed in the SERP documents, the Best Evidence Rule does
not preclude a witness from testifying to facts recorded in a writing from his or her personal
knowledge. *See* FED. R. EVID. 1002. To the extent that Mr. Ralph and Mr. DeMarco have
personal knowledge of the matters discussed in the affidavits, there can be no violation of the
Best Evidence Rule.

duty even if the Court concludes that the SERPs qualify as top-hat plans: "[e]ven if a 'top hat' plan, GM would still be bound by federal common law, which includes contract and equitable principles, such as fiduciary duties. (Pl.'s Resp. at 20.) The primary case cited by Plaintiff in support of this argument is *Varity Corp. v. Howe*, 516 U.S. 489 (1996). In *Varity*, a group of former employees and beneficiaries under an ERISA-protected employee welfare benefit plan claimed that the plan administrator, who was also their employer, used trickery to induce them to withdraw from the plan and to forfeit their benefits. *See id.* at 491. One of the questions examined by the Supreme Court was whether the employer's deception violated its fiduciary obligations under ERISA § 404(a), codified at 29 U.S.C. § 1104. *See id.* at 506-507. Plaintiff finds solace in the Court's affirmative answer.

The Court finds *Varity*, along with the other five cases cited by Plaintiff in Section VI of his brief, inapplicable to the present case. Simply put, none of these cases involved top-hat plans. In *Varity*, the Court found that the employer and plan administrator breached its fiduciary duty under ERISA § 404(a), 29 U.S.C. § 1104. However, as explained above, sections 1101 through 1114 do not apply to top-hat plans. "[A] top hat administrator has no fiduciary responsibilities." *Goldstein v. Johnson & Johnson,* 251 F.3d 433, 443 (3d Cir. 2001). Accordingly, in both *Demery* and *Duggan*, for example, the Second and Ninth Circuits, respectively, affirmed the lower courts' decision to dismiss plaintiffs' breach of fiduciary duty claims under ERISA on the grounds that the plans in both cases were top-hat plans. *See Demery*, 216 F.3d at 290; *Duggan*, 99 F.3d at 313. Plaintiff has failed to bring to the Court's attention any case involving a top-hat plan where the employer or plan administrator was found liable for breach of fiduciary duty. Moreover, the Court can locate no such case. Accordingly, the Court will dismiss Plaintiff's claims under 29 U.S.C. §§

1104 and 1106 for breach of fiduciary duty.[10]

## IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S STATE LAW CLAIMS FOR BREACH OF CONTRACT, COMMON LAW FRAUD AND SILENT FRAUD, AND INNOCENT REPRESENTATION

Counts Four, Five, and Six of Plaintiff's Complaint contain state law claims for breach of contract, common law fraud and silent fraud, and innocent representation, respectively.[11] Defendant argues that he is entitled to summary judgment on these counts because they involve "an effort to obtain an ERISA benefit, either directly or in disguised form." (Def.'s Mot. at 2.) Defendant relies primarily on three cases in support of this argument: *Tassinare v. Am. Nat'l Ins. Co.*, 32 F.3d 220 (6th Cir. 1994), *Trustees of Carpenters' Pension Trust Fund v. AAA Mortgage Corp.*, 269 F. Supp.2d 931 (E.D. Mich. 2003), and *Peters v. Lincoln Elec. Co.*, 285 F.3d 456 (6th Cir. 2002). On the other hand, Plaintiff contends that his state law claims are not preempted by ERISA, and argues that Defendant's arguments ignore controlling Sixth Circuit authority, mainly *Marks v. Newcourt Credit Group, Inc.*, 342 F.3d 444 (6th Cir. 2003). (*See* Pl.'s Resp. at 22.)

According to 29 U.S.C. § 1144, ERISA "supersede[s] any and all State laws insofar

---

[10] The Court, therefore, need not address Defendant's alternative argument that Plaintiff's claims for breach of fiduciary duty are time-barred.

[11] The Court notes that Count Three of Plaintiff's Complaint contains a claim for estoppel. It is not entirely clear to the Court whether Plaintiff intended to bring this claim under state law or federal law. However, the Court believes that the claim is brought under federal law for the following reasons: (1) Federal courts recognize an estoppel cause of action under ERISA; (2) Plaintiff discusses this law in his brief; and (3) Plaintiff states in his Complaint that, "GM is . . . estopped to deny SERP benefits to Straney; and, pursuant to ERISA § 502 [codified at 29 U.S.C. § 1132], this Court should enjoin GM from denying SERP benefits to Straney." (Pl.'s Compl. at ¶ 57.) In any case, to the extent that Plaintiff intended to bring this claim under state law, it is preempted by ERISA for reasons stated below. Plaintiff's federal law estoppel claim is addressed in Section VI of this Opinion and Order.

as they may now or hereafter relate to any employee benefit plan." Section 1144 has an "expansive

sweep." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987). Indeed, the Supreme Court has

repeatedly interpreted the phrase *relate to* in the context of section 1144 very broadly: "[a] law

'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with

or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983). *See also

Metro. Life Ins. Co. v. Mass.*, 471 U.S. 724 (1985) (reaffirming this language); *Pilot Life Ins. Co.*,

481 U.S. at 45-46 (same). The Sixth Circuit "has repeatedly recognized that virtually all state law

claims relating to an employee benefit plan are preempted by ERISA." *Cromwell v.

Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1276 (6th Cir. 1991) (citing cases). Thus, "only

those . . . state law claims whose effect on employee benefit plans is merely tenuous, remote or

peripheral are not preempted." *Id.* The Sixth Circuit has expanded on the meaning of this statement

with useful examples:

> a state-law action only peripherally affects a plan where a plaintiff refers to
> a clause in the benefit plan summary to support his employment
> discrimination claim, or where a plaintiff simply makes "reference to
> specific, ascertainable damages" by citing a life insurance contract.

*Marks*, 342 F.3d at 452 (citing *Wright v. Gen. Motors Corp.*, 262 F.3d 610, 615 (6th Cir. 2001)).

Additionally, "[i]n deciding whether state-law claims are preempted by ERISA, [the Sixth Circuit

has] focused on the remedy sought by plaintiffs." *Id.* at 453 (citing *Lion's Volunteer Blind Indus.,

Inc. v. Automated Group Admin., Inc.*, 195 F.3d 803, 806 (6th Cir. 1999)). As Defendant pointed

out in its brief, the Court also notes that ERISA preempts state law causes of action regarding top-

hat plans. *Bigda v. Fischbach Corp.*, 898 F. Supp. 1004, 1016 (S.D. N.Y. 1995), *aff'd*, 101 F.3d 108

(2d Cir. 1996).

The Court finds that Plaintiff's state law claim for breach of contract (Count Four) is clearly preempted under section 1144. Furthermore, after a careful review of the parties' briefs and the applicable case law, most notably the *Marks* case, the Court finds that Plaintiff's claims for common law fraud and silent fraud, and innocent representation (Counts Five and Six, respectively) are also completely preempted by ERISA, and will therefore grant Defendant's Motion for Summary Judgement as to these claims, as well.

In Count Four of his Complaint (breach of contract), Plaintiff states, in relevant part, that "GM's denial of SERP benefits to Straney constitutes a breach of contract." (Pl.'s Compl. at ¶ 62.) With respect to the relief sought, Plaintiff explains that "Straney has suffered damages, equal to the value of past and future benefits due him under SERP . . ." (*Id*. at ¶ 63.) Focusing on the remedy sought pursuant to the Sixth Circuit's instruction in *Marks* and other cases, and in light of section 1144's sweeping net, there is no doubt that Plaintiff's breach of contract claim is completely preempted. This claim "relates to" ERISA in a most direct way: whether Defendant is found liable hinges entirely on the propriety of Defendant's decision to deny Plaintiff SERP benefits. The Court will therefore grant Defendant's Motion for Summary Judgment as to this Count.

Whether Counts Five and Six are preempted presents a far more difficult question. Plaintiff alleges common law fraud and silent fraud in Count Five and innocent misrepresentation in Count Six. In Count Five of his Complaint, Plaintiff states, in relevant part,

> 66. Based on GM's fraudulent conduct, including its silent fraud, Straney agreed to transfer to AAM.

> 67. Straney is entitled to recover as damages the amounts which he has lost as a result of this transfer from GM to AAM . . . .

> 68. As a direct and proximate result of GM's fraudulent conduct, including its silent fraud, Straney has suffered damages in an amount presently undetermined but substantially in excess of $75,000.

(Pl.'s Compl. at ¶¶ 66-68.)  In Count Six of the Complaint, Plaintiff states, in relevant part,

> 70. Even if GM did not intentionally deceive Straney, it is still liable for innocent misrepresentation which caused Straney to terminate his employment by GM and transfer to AAM . . . .

> 72. As a direct and proximate result of GM's innocent misrepresentation, Straney has suffered damages in an amount presently undetermined but substantially in excess of $75,000.

(Pl.'s Compl. at ¶¶ 70, 72.)  Although not expressly stated, it is obvious that, in asking for the amount lost as a result of his transfer from GM to AAM, Plaintiff is really asking for, at the very least, SERP benefits.  Plaintiff does not indicate whether he is asking for additional damages unassociated with SERP benefits.  However, no where in the pleadings does Plaintiff appear to reference any other type of damages stemming from his transfer from GM to AAM.  The question presented here is whether these claims "relate to" the SERP, or instead only "peripherally effect" it.

As Plaintiff indicates, the *Marks* case is helpful.  Marks was a former employee who participated in a severance plan that entitled him to a substantial monetary payment if he was terminated from employment without just cause.  *See Marks*, 342 F.3d at 449.  The plan also provided that, in the event of a change of corporate control, Marks would be entitled to benefits if he suffered a "qualifying termination" within two years of the change of control.  *See id.*  A change of corporate control eventually occurred when Newcourt purchased all outstanding shares, but Marks continued to be employed in a substantially similar position to that which he previously held.

*See id.* Marks was still covered by the severance plan, but would have to make a claim within two years of the change of control in order to be entitled to benefits for suffering a qualified termination. *See id.*

Before the two-year expiration date, Marks' job responsibilities and bonus calculations began to change in a way that was disadvantageous to him. *See id.* Both before and after the expiration of the two-year deadline, Marks sought and received assurances that the changes were not intended to reduce his job responsibilities or compensation. *See id.* After the two-year deadline had passed, Marks received a bonus that was significantly lower than bonuses he typically received before the change of control. *See id.* Marks alleged that he had been constructively terminated and sought to exercise his rights under the benefit plan. *See id.* at 450. However, his claim was denied on the grounds that he did not bring it within the two-year period. *See id.*

Marks then filed suit, claiming that he had been fraudulently induced by Newcourt to become employed at the new corporation, to purchase 14,665 shares of Newcourt stock, and to borrow $453,258 to finance that purchase. *See id.* at 449, 453. Marks further alleged that Newcourt breached the employment agreement, wrongfully deprived him of benefits under the plan, and engaged in fraudulent conduct that reduced his duties and compensation, while continually assuring the him that neither was being reduced. *See id.* The district court found that Marks' claims for breach of contract, fraud, and misrepresentation were preempted by ERISA. *See id.* at 451. The Sixth Circuit reversed. *See id.*

For each of his state law causes of action, Marks sought in damages "an amount presently undetermined but believed to exceed $150,000." *Id.* at 453. According to the *Marks* court:

[b]ecause he seeks damages equaling the benefits he would have received

under the plan, it seems at first glance that his claims relate to an ERISA benefit claim. However, a close reading of Marks's complaint reveals that the reference to plan benefits was only a way to articulate "specific, ascertainable damages."

*Id*. at 453 (quoting *Wright*, 262 F.3d at 615). The court continued,

[w]e conclude that the district court erred in finding that Marks's state-law claims were preempted to the extent that the claims alleged would have a "tenuous, remote or peripheral' effect on the plan. Marks alleges that, without cause, Newcourt significantly altered his duties and reduced his compensation. Because this conduct may constitute a breach of Marks's employment contract irrespective of the plan, the breach of contract claim is not preempted.

Moreover, Marks's fraud and misrepresentation claims are not entirely preempted, even though they clearly related to ERISA insofar as they allege that Newcourt's conduct induced Marks "not [to] exercise his rights under the [severance plan] until [after the two-year deadline]." To the extent that Marks alleges that fraud or misrepresentation induced him to accept employment as an initial matter, he can state a state-law claim for fraud and/or innocent misrepresentation. Marks alleges that Newcourt's conduct induced him to become employed by Newcourt, to purchase 14,665 shares of Newcourt stock, and to borrow $453,258 to finance that purchase. These allegations clearly do not relate to an ERISA plan. Therefore, we remand to the district court for adjudication of those aspects of Marks's fraud and misrepresentation claims not relating to the plan, as well as for adjudication of Marks's breach of contract claim.

*Id*.

The circumstances of the *Marks* case are subtly different from those of the present case. Notwithstanding *Marks*, the Court finds that Plaintiff's claims for common law fraud, silent fraud, and misrepresentation are entirely preempted by ERISA. The court held that Marks' fraud and misrepresentation claims were not preempted by ERISA insofar as Marks alleged that Newcourt's conduct induced him to become employed by Newcourt, to purchase 14,665 shares of Newcourt stock, and to borrow $453,258 to finance the purchase. *See Marks*, 342 F.3d at 453.

Newcourt's alleged misconduct, then, may have caused Marks to sustain damages that were separate and apart from damages relating to an ERISA plan. However, in the present case, there are no such "separate and apart" damages asserted by Plaintiff. It is true that both Marks and Plaintiff in this case allege that their former employers fraudulently induced them, through misrepresentation, to accept employment; however, the alleged misconduct in *Marks* had implications not related to Marks' ERISA claims. Here, on the other hand, the only implication stemming from Defendant's alleged fraud and misrepresentation is the loss of SERP benefits. In other words, Marks sustained damages not relating to an ERISA plan when he accepted employment with Newcourt and took out a loan to purchase stock. His claim was therefore not preempted to that extent. Plaintiff here does not claim to have sustained any such damages as a result of his accepting employment with AAM. Therefore, in the Court's view, Plaintiff's state law claims for common law fraud, silent fraud, and misrepresentation relate to the SERP, and the Court must therefore grant Defendant's Motion for Summary Judgment as to Counts Five and Six of the Complaint.

V.   **DEFENDANT'S MOTION TO AFFIRM THE PLAN ADMINISTRATOR'S DECISION DENYING PLAINTIFF SERP BENEFITS**

"[D]espite the exemption of top hat plans from many of ERISA's regulations, ERISA's enforcement provision clearly permits participants in top hat plans . . . to bring civil actions 'to enforce the substantive provisions of the Act or to recover benefits due or otherwise enforce the terms of the plan.'" *Kemmerer v. ICI Americas Inc.*, 70 F.3d 281, 286-287 (3d Cir. 1995) (quoting *Barrowclough v. Kidder, Peabody & Co.*, 752 F.2d 923, 935 (3d Cir.1985)). According to 29 U.S.C. § 1132(a)(1)(B), which applies to top-hat plans,

> [a] civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the

terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

With respect to top-hat plans, courts are in agreement that "breach of contract principles, applied as a matter of federal common law, govern disputes arising out of the plan documents." *Kemmerer*, 70 F.3d at 287. *See also In re New Valley*, 89 F.3d at 149 ("[t]op hat plans are . . . governed by general principles of federal common law").

"A primary purpose of ERISA is to ensure the integrity and primacy of . . . written plans." *Health Cost Controls v. Isbell*, 139 F.3d 1070, 1072 (6th Cir. 1997) (citing *Duggan*, 99 F.3d at 309-10 and *Van Orman v. Am. Ins. Co.*, 680 F.2d 301, 312 (3d Cir.1982)). "Thus, the plain language of an ERISA plan should be given its literal and natural meaning." *Id.* (citing *Burnham v. Guardian Life Ins. Co.*, 873 F.2d 486, 489 (1st Cir. 1989)); *see also Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998) ("[t]he general principles of contract law dictate that we interpret a Plan's provisions according to its plain meaning, in an ordinary and popular sense"). Accordingly, "courts must give effect to the unambiguous terms of an ERISA plan." *Lake v. Metro. Life Ins. Co.*, 73 F.3d 1372, 1379 (6th Cir. 1996) (citing *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir. 1993)).

Before examining the parties' substantive arguments as to whether the plan administrator's decision to deny Plaintiff SERP benefits should be affirmed, the Court first discusses the standard of review governing the plan administrator's decision to deny Plaintiff benefits under the SERP. According to Plaintiff, the Court should review the plan administrator's decision to deny SERP benefits *de novo*. Defendant, on the other hand, contends that either the arbitrary and capricious standard or the abuse of discretion standard is appropriate. After reviewing the case law,

the Court notes that the circuits appear to be split as to which of these standards of review apply in

the special context of a top-hat plan, and the Sixth Circuit has not yet examined the issue.[12]  Because

_____

[12] In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), the United States Supreme Court held that a court must review a plan administrator's denial of benefits under an abuse of discretion standard if the ERISA plan unambiguously grants the plan administrator discretionary authority to determine the eligibility for benefits or to construe the terms of the plan.  On the other hand, if the ERISA plan fails to unambiguously grant the plan administrator such discretionary authority, the Supreme Court has held that a court should review the plan administrator's denial of benefits under a *de novo* standard.  *Id*.

Both the GM and Delphi SERPs unambiguously grant the plan administrator discretionary authority to construe the terms of the plan.  The GM SERP, at Section II(c), states, in pertinent part,

> [t]he Plan Administrator has final discretionary authority to construe, interpret, apply, and administer the Program and serves as the final step of the Program appeal procedure.  Any interpretation or determination regarding the Program made by the Plan Administrator shall be given full force and effect, unless it is proven that the interpretation or determination was arbitrary and capricious.

The Delphi SERP contains similar language.  Therefore, under the *Firestone* framework, an abuse of discretion standard would be applicable.

However, some circuits have found that the *Firestone* standard does not apply to top-hat plans.  For example, in *Goldstein*, the Third Circuit held that, "[g]iven the unique nature of top hat plans, we believe the holding of *Firestone Tire* requiring deferential review for the discretionary decisions of administrators to be inapplicable."  251 F.3d at 442-443.  According to the *Goldstein* court, then, *de novo* review applies to top-hat plans even when they grant plan administrators discretionary authority.  *See id*.  Five years after *Goldstein*, the Eighth Circuit followed suit.  *See Craig v. Pillsbury Non-Qualified Pension Plan*, 458 F.3d 748, 752 (8th Cir. 2006).

Conversely, some courts *have* applied the *Firestone* standard of review framework to top-hat plans.  *See, e.g., Olander v. Bucyrus-Erie Co.*, 187 F.3d 599, 604 (7th Cir. 1999).  However, as the *Goldstein* court noted, the *Olander* court did not "explicitly question whether *Firestone Tire* should be so freely transferrable."  *Goldstein*, 251 F.3d at 443 n.6.

On the facts of this case, there is considerable authority for the application of yet another standard of review: the arbitrary and capricious standard.  Because "top hat plans are . . . governed by general principles of federal common law," and courts "must give effect to the

the Court would reach the same ultimate conclusion irrespective of the standard of review employed, the Court need not speculate as to how the Sixth Circuit might decide this issue.

Defendant urges the Court to affirm the plan administrator's decision to deny Plaintiff SERP benefits. Defendant argues that the plan administrator's decision to deny Plaintiff's request for SERP benefits was correct under either an arbitrary and capricious standard or a *de novo* standard because Plaintiff "does not meet the eligibility criteria plainly spelled out by the unambiguous [SERP] language." (Def.'s Mot. at 2.) Specifically, Defendant cites the eligibility requirements at Section IV of both SERPs: "[t]o be eligible for a . . . SERP Benefit under the . . . SERP Formula, an executive employee must: (1) be at least 62 years old at retirement . . ." Defendant explains, Plaintiff

> was not 62 at the time he separated from GM. He does not meet the eligibility criteria plainly spelled out by the unambiguous [SERP] language. The plan administrator's decision was correct under either "an arbitrary and capricious" standard of review specified in the SERP documents, as well as by certain court authority, or by a *de novo* standard.

(Def.'s Mot. at 2.) Defendant continues,

> Straney was born on August 18, 1942. He left GM's employ on or about March 1, 1994, when he separated to commence working with . . . AAM. At the time of separation, then, he was 51 years old. Thus, he was not a 62-year-old employee of GM or Delphi "at the date of retirement" under the SERP program eligibility.

(*Id*. at 10) (citation omitted).

---

unambiguous terms of an ERISA plan," Defendant argues that the arbitrary and capricious standard should apply given that both the GM and the Delphi SERPs expressly dictate this result. *See In re New Valley*, 89 F.3d at 149; *Lake*, 73 F.3d at 1379 (citing *Boyer*, 986 F.2d at 1005).

On the other hand, Plaintiff argues that the oral representations made by GM executives, along with written representations made in a GM-issued brochure,[13] "constitute Plan interpretation and construction which GM could not reverse after Straney moved to AAM." (Pl's Resp. at 4.) Indeed, according to Plaintiff, the representations "were made in the course of plan administration, by persons with authority to interpret the plan documents, and thus they constitute binding interpretations of the SERP." (*Id*. at 18.) Plaintiff cites *In re New Valley Corp*., 89 F.3d at 148-149, and other similar cases, for the proposition that "plans, like the GM SERP, constitute unilateral contracts which cannot be changed after performance." (*Id*. at 4 n.6; *see also id.* at 18.) Plaintiff insists that he "performed his obligations to GM, induced other employees to join AAM, and himself transferred to AAM" and that "GM greatly benefitted from [his] performance." (*Id*. at 18.) "Thus, GM could not later revoke [his] rights" by denying him SERP benefits. (*Id*.)

Defendant counters by arguing that neither the oral representations made to Plaintiff by executives at GM, nor the brochure relied upon by Plaintiff, were effective to change the terms of the SERP. Defendant cites the language of the GM SERP at Section IX(a), under the heading "Amendment, Modification, Suspension, or Termination by Corporation:"

> [n]o oral statements can change the terms of this Program. This Program can

---

[13] The brochure to which Plaintiff refers is called "Your Benefits and Status as a General Motors Salaried Employee Following the Sale of Saginaw Final Drive and Forge Business Unit." This brochure was issued to all GM salaried employees who transitioned to AAM. Plaintiff relies upon the following language from the brochure:

> [c]redited service under the GM Salaried Retirement Program ("GM Program") and the American Axle Manufacturing Inc. Retirement Plan will be combined to determine any eligibility to retire under the GM Program.

(Pl.'s Resp. at Ex. B.) The brochure is dated August 14, 1994.

only be amended, in writing, by the Board of Directors, the Executive Compensation Committee, or an appropriate individual or committee as designated by the Board of Directors or Executive Compensation Committee. Absent an express delegation of authority from the Board of Directors or the Executive Compensation Committee, no one has the authority to commit the Corporation to any benefit or benefits provision not provided for under this Program or to change the eligibility criteria or other provisions of this Program.

Thus, Defendant argues that

[t]he GM SERP provides, by its very terms, that it can be amended only in writing by the Board of Directors, the Executive Compensation Committee of the Board of Directors, or an appropriate individual or committee designated by the Board or by the Board's Executive Compensation Committee. No such amendment was made providing that GM executive employees who resigned to commence employment with AAM in 1994 would retain their SERP eligibility. Such eligibility is directly contrary to the provisions of the plan.

(Def.'s Mot. at 13-14.) Given that the clear and unambiguous language of the SERP agreements state that any amendments must be made in writing by the Board of Directors, the Executive Compensation Committee, or a delegate of either, Defendant contends that "[a]ny comments that were made to [Straney] by individuals other than the Board of Directors of GM or the Board's delegate could not have the legal effect of altering the GM plan."(*Id.* at 14.)

Defendant further argues that any representations made by GM to Plaintiff did not specifically mention SERP benefits, and therefore Defendant made no legally enforceable commitment to pay Plaintiff SERP benefits if he transitioned from GM to AAM in 1994:

Straney argues that he is entitled to SERP benefits because of a written statement attached to his declaration and oral statements allegedly made to him in 1994 at the time of the [Saginaw Final Drive and Forge Business Unit] sale to AAM. However, a review of Straney's allegations reveals that there are no charges made by him which specifically involve commitments about the SERP. Rather, it was his assumption that statements with regard

to other retirement benefits also involved the SERP. [Straney] states that he "would have expected GM to make this distinction," if SERP was to be treated differently. Yet, there was no reference to the SERP, not even in his notes of his conference with Jeff Kimpan . . . . Nor is there reference in the written document to SERP benefits.

(Def.'s Reply at 2-3) (internal citation omitted). With respect to the brochure, Defendant also points out that it states, on the cover,

> [t]he benefits to which an employee and/or retiree is entitled are determined solely by the provisions of the applicable benefit program . . . . [N]o one has the authority to commit the Corporation to any benefit or benefit provisions not provided for under the applicable benefit program, or to change the eligibility criteria or any other provisions of such program.

(Pl.'s Resp. at Ex. B) (emphasis in original). Consequently, Defendant seems to argue that not only does the brochure not specifically mention SERP benefits, but even if it did the brochure would not be effective to alter the terms of the SERP.

Plaintiff does not appear to dispute Defendant's contention that at no time did GM make representations specifically referencing SERP benefits. Instead, Plaintiff argues that, in referencing "retirement benefits" and "retirement programs," he "reasonably believed that this language applied to all GM retirement programs, including his SERP retirement program" and that "[n]o where did GM, orally or in writing, advise [him] to the contrary." (Pl.'s Resp. at 8) (citation omitted). Therefore, Plaintiff contends that, because SERP benefits are a retirement benefit, *Defendant* had the affirmative responsibility to inform GM employees transitioning to AAM that SERP benefits would be treated differently.

Given the clear and unambiguous language of the SERPs, the Court must agree with

Defendant's position, and grant its Motion to Affirm the Plan Administrator's Decision. The Court reaches this conclusion irrespective of the standard of review employed. The actions allegedly taken—and the representations allegedly made—by Defendant and its agents, while misleading and deceptive, do not give rise to an action at law under ERISA.[14]

As discussed above, top-hat plans are governed by general principles of federal common law. *See In re New Valley*, 89 F.3d at 149. Because the issue here involves a dispute arising out of plan documents, the Court must apply federal common law breach of contract principles. *See Kemmerer*, 70 F.3d at 287. This means that the plain language of the GM and Delphi SERP documents must be given its literal and natural meaning. *See Health Cost Controls*, 139 F.3d at 1072 (citing *Burnham*, 873 F.2d at 489). The Court must give effect to the unambiguous terms of the documents. *See Lake*, 73 F.3d at 1379 (citing *Boyer*, 986 F.2d at 1005). In the present case, the language of the SERP agreements is unambiguous, and therefore only one conclusion is possible. To be eligible to receive SERP benefits, a GM executive must be 62 years old at retirement from GM. When Plaintiff transitioned from GM to AAM, he was not yet 62. Defendant made representations to Plaintiff that his transition would have no effect on retirement benefits, and that

employment at AAM would qualify as employment by GM for purposes of benefit eligibility and computation. Plaintiff's belief that "retirement benefits" included SERP benefits was reasonable, and if GM intended to treat SERP benefits differently, it should have had the decency to so inform Plaintiff before his decision to separate from GM. Instead,

---

[14] See Section VI of this Opinion and Order, below, for the Court's discussion of Plaintiff's equitable estoppel claim.

Defendant misled Plaintiff and acted without his best interest in mind.

However, under the clear terms of the SERP agreements, GM's oral and written representations to Plaintiff were not effective to alter the unambiguous eligibility requirements contained in the SERP documents. The SERP agreements specifically dictate the procedures for modification and amendment, and the representations allegedly made by GM and its executives were not effective to change the eligibility requirements.[15]

Additionally, Plaintiff devotes a significant portion of his brief to addressing various alleged procedural defects in how his claim for SERP benefits was handled by GM and Delphi. Specifically, Plaintiff asserts the following six procedural flaws: (1) there was no decision by the GM or Delphi plan administrator; (2) there was no administrative record; (3) there was no meaningful investigation of Plaintiff's claim for SERP benefits; (4) evidence submitted by Plaintiff was ignored by Defendant; (5) Defendant failed to provide Plaintiff with a statement of his rights; and (6) Defendant "ignored" his appeal. As a remedy for these alleged violations, Plaintiff asks that the Court not afford deference to GM's decision to deny him SERP benefits. (Pl.'s Resp. at 1 n.4, 16-17.) Since the Court has not done so, it sees no reason to address the merits of these allegations.

In light of the clear and unambiguous language contained in the SERP agreements, the Court will grant Defendant's Motion to Affirm the Plan Administrator's Decision Denying Plaintiff SERP Benefits.

## VI. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S ESTOPPEL CLAIM UNDER ERISA

---

[15] Therefore, the Court need not address Defendant's alternative argument that the plan administrator's decision should be affirmed on the grounds that Plaintiff's claim for SERP benefits was untimely.

Plaintiff relies on estoppel as a backup argument: "[i]f GM's representations to Straney did not constitute a binding interpretation of SERP which entitles Straney to SERP benefits, then GM's representations estop GM." (Pl.'s Resp. at 19.) The elements of an estoppel claim under ERISA are as follows: (1) there must be conduct or language amounting to a representation of material fact; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must intend that the representation be acted on, or the party asserting the estoppel must reasonably believe that the party to be estopped so intends; (4) the party asserting the estoppel must be unaware of the true facts; and (5) the party asserting the estoppel must reasonably or justifiably rely on the representation to his detriment. *See Moore v. LaFayette Life Ins. Co.*, 458 F.3d 416, 428-429 (6th Cir. 2006) (citing *Sprague v. General Motors Corp.*, 133 F.3d at 388, 403 (6th Cir. 1998)).

The Court finds there to be a genuine issue of material fact with respect to each of the five elements listed above. First, a reasonable jury may find that there was conduct or language from Defendant amounting to a representation of material fact. Plaintiff claims that he was told by three GM executives—Mr. John Monk, Mr. Jeff Kimpan, and Mr. Bill Herren—that his transition from GM to AAM would have no effect on his retirement benefits. The SERP is a retirement benefit. Plaintiff has retained his notes from his meeting with Mr. Kimpan. (*See* Pl.'s Resp. at Ex. A.) Plaintiff's handwritten notes indicate that Mr. Kimpan did indeed make this representation on behalf of GM.[16] In addition, the GM-issued brochure described above tends to support the Court's

---

[16] The Court finds Plaintiff's notes from this meeting to be especially convincing. Mr. Kimpan told Plaintiff, "your retirement is intact with GM and AAM sharing the cost based on your cumulative years of service divided by the GM and AAM time." Mr. Kimpan also said, "unless you are concerned about getting (1) or (2) checks after you retire stop worrying about retirement." (See Pl.'s Resp. at Ex. A.)

finding on this prong.

Moreover, with respect to prongs (2) and (3), a reasonable jury could conclude from the facts and circumstances surrounding this case that the executives making material representations to Plaintiff were aware that his transition from GM to AAM would preclude him from obtaining SERP benefits later on, and that the representations were made in the hope that Plaintiff would transfer to AAM. With respect to prong (4), Plaintiff was clearly unaware that transitioning to AAM would cost him his SERP benefits. According to Plaintiff, he "transferred to AAM in reliance on the representations and assurances made by Mr. Kimpan and others that [his] retirement would be intact and that employment by AAM would be equivalent to employment by GM." (*See* Pl.'s Resp. at Ex. 7, ¶ 9.) Given that Plaintiff "would not have transitioned from GM to AAM but for GM's representations," the Court finds that Plaintiff has met its initial burden of proof as to this element. (*See* Pl.'s Compl. at ¶ 19.)

With respect to element (5), the Sixth Circuit has held that

> [p]rinciples of estoppel, however, cannot be applied to vary the terms of unambiguous plan documents; estoppel can only be invoked in the context of ambiguous plan provisions. There are at least two reasons for this. First, as we have seen, estoppel requires reasonable or justifiable reliance by the party asserting the estoppel. That party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents *available to or furnished to the party.* Second, to allow estoppel to override the clear terms of plan documents would be to enforce something other than the plan documents themselves. That would not be consistent with ERISA.

*Sprague*, 133 F.3d at 404 (emphasis added). Plaintiff states repeatedly throughout the pleadings that he did not have a copy of the SERP documents until well after he transitioned to AAM, and that he

therefore depended on GM's representations to protect his rights under the SERP agreements.[17] If the fact-finder believes that the SERP documents were not made available to Plaintiff, then his reliance on information that eventually turned out to be "inconsistent with the clear and unambiguous terms of the plan documents" may have been reasonable. *See id.*; *see also High v. E-Systems Inc.*, 459 F.3d 573, 580 (5th Cir. 2006) (recognizing that an express finding of plan ambiguity would undercut the reasonableness of any detrimental reliance, but is not a requirement of an estoppel claim under ERISA); *Mello v. Sara Lee Corp.*, 431 F.3d 440, 447 (5th Cir. 2005) (same). Though reliance can seldom be reasonable if it is inconsistent with the clear and unambiguous terms of a plan document, this case may be the rare exception because Plaintiff insists that he did not have access to the SERP documents prior to his decision to transition to AAM.

---

[17] *See* Pl.'s Resp. at Ex. 7, ¶¶ 4-5 ("[a]t the time of the transfer to AAM, I did not have a copy of the GM SERP Agreement . . . . Because I did not have a copy of the plan documents, I was completely dependent upon GM's representations about my rights and obligations); *Id.* at 2 ("GM did not provide Straney will [sic] access to plan documents which stated . . . appeal obligations until after the time GM now contends that Straney should have appealed"); *Id.* at 5 ("GM did not provide Straney will [sic] a copy of the retirement plan documents, including SERP documents . . ."); *Id.* at 18 ("it is important to remember that GM never provided Straney with a copy of the SERP agreement, and, therefore, Straney was dependent upon GM's representations to him in order to understand his rights); *Id.* at 11 n.9 ("Straney was not provided with a copy of either the GM or Delphi SERP agreements until January 2006 . . ."); *Id.* at 21 ("Straney demanded his rights to [SERP] benefits. Initially he did so without the benefit of the actual SERP agreement"); *Id* 19 ("Straney did not have access to the SERP documents . . ."); Statement of Material Facts Not in Dispute at Ex. E (handwritten note) ("Michael D. Straney did not a receive a copy of the Delphi SERP program from Delphi prior to 1/30/06"); Pl.'s Resp. to Def.'s Statement of Undisputed Facts at ¶ 24 ("at the time of his August 8, 2005, letter, Straney did not have a copy of the SERP documents and therefore Straney was not clear what steps he was required to take to make a claim. Neither Delphi nor GM provided him this information . . . . Delphi did not provide Straney with a copy of any SERP agreement until January, 2006, at which time Mr. Petrie sent Straney a copy of the Delphi SERP agreement. GM did not provide Straney with a copy of the GM SERP until after the complaint was filed"); Pl.'s Compl. at ¶ 25 ("GM refused Straney's request for copies of the relevant SERP documents for the period after 1999").

Generally speaking, "[e]quitable estoppel is grounded on notions of fair dealing and good conscience and is designed to aid the law in the administration of justice where injustice would otherwise result." *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999 (2d Cir. 1996) (citing *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 301 (2d Cir. 1996); *Marine Transp. Services Sea-Barge Group, Inc. v. Python High Performance Marine Corp.*, 16 F.3d 1133, 1138 (11th Cir. 1994)). Plaintiff contends, in essence, that GM's Director of Human Resources at the Saginaw Final Drive and Forge Business Unit—among other executives at GM—told him to "stop worrying about retirement" while depriving him of the very documents that he needed to protect his rights under the SERP agreements. If this is true, estoppel would be an appropriate remedy.

VII.    **CONCLUSION**

Accordingly,


IT IS ORDERED that Defendant's Motion to Dismiss Plaintiff's breach of fiduciary duty claim (Count Two of Plaintiff's Complaint) is granted.


IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment with respect to Plaintiff's state law claims for breach of contract, common law fraud and silent fraud, and innocent misrepresentation (Counts Four, Five, and Six of Plaintiff's Complaint) is granted.


IT IS FURTHER ORDERED that Defendant's Motion to Affirm the Plan Administrator's Decision is granted.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment with respect to Plaintiff's estoppel claim under ERISA is denied.

_____s/Bernard A. Friedman_____
BERNARD A. FRIEDMAN
CHIEF UNITED STATES DISTRICT JUDGE

Dated: November 8, 2007
       Detroit, Michigan

I hereby certify that a copy of the foregoing document
was served upon counsel of record by electronic and/or first-class mail.

s/Carol Mullins
Case Manager to Chief Judge Friedman